IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| VIOLEY FAIRLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV83 |
| | ) | |
| CITY OF DURHAM, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND RECOMMENDATION<br>OF UNITED STATES MAGISTRATE JUDGE</u>

Fairley filed suit, alleging unpaid overtime/compensatory time off and retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, for (Counts One and Two, respectively), unlawful demotion in violation of Article I, Section I of the North Carolina Constitution (Count Three), and unlawful termination in violation of that same provision (Count Four). In the First Amended Complaint, Fairley alleges that the defendant, the City of Durham ("the City"), did not pay her owed overtime wages as required by the FLSA and that when she lodged a complaint regarding the same, her supervisors demoted her and then fired her.

Before the Court is the defendant's Motion to Dismiss Counts Two, Three, and Four, and the record-keeping FLSA provision alleged in Count One. Finally, the defendant

moves to dismiss all FLSA claims preceding February 3, 2023 as time-barred. *See* Docket Entry 13.

In sum, the defendant argues that even taking the facts in the light most favorable to Fairley as pled, she has not alleged that the City violated the FLSA record-keeping provisions, nor has she established that her demotion and termination were related to the alleged unpaid overtime wages. Further, the City maintains that because Fairley has not alleged facts indicating that the City either knew or showed reckless disregard for purported violations of the FLSA, the two-year statute of limitations (versus three-year) applies to those claims. Finally, the City argues that Fairley's North Carolina Constitutional claim does not apply to the alleged wrongful conduct.

For the reasons set forth below, the Court should deny the City's motion to dismiss Count Two, as well as its motion to limit FLSA claims to the two-year statute of limitations. The Court should grant the City's motion to dismiss Counts Three and Four.

## I.  FACTS

Because all well-pled facts are accepted as true and considered in the light most favorable to the plaintiff, below are the facts as Fairley has alleged in the First Amended Complaint, Docket Entry 11, (Compl.).[1] *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009) (citation modified).

The City hired Fairly on November 2, 2020 as a Senior Fiscal Specialist; in February of 2023, the City promoted Fairley to the title of Accounts Payable Coordinator. *See* Compl. ¶¶ 13-14. Throughout her employment, the City paid Fairly an annual salary and classified her as non-exempt under the FLSA, meaning she was eligible to earn overtime wages or accrue compensatory time off when she worked in excess of 40 hours in a workweek. *See id.* ¶ 17.

On January 28, 2021, Fairley signed an Overtime/Compensatory Time Agreement, wherein she agreed to

receive compensatory "comp" time (instead of overtime pay) for all hours worked beyond 40 a week "while we are full time back in the office with prior approval." *See id.* ¶¶ 18-19. The agreement noted "Reminder while teleworking no comp time or overtime is given." *See id.*

Pursuant to the agreement, Fairley earned comp time when working more than 40 hours in the office, but not while working remotely. *See id.* ¶ 20. The City scheduled Fairley to work from 8 am until 4 pm with an unpaid half hour lunch break, totaling 37.5 hours per workweek. *Id.* ¶ 22. However, as alleged, Fairley "routinely and frequently worked more than … 2.5 [] hours outside of her regularly scheduled work shifts remotely from home." *See id.*

On May 6, 2024, Fairley complained to Tim Flora, the City's Finance Director, about the City's failure to award her comp time-off for remote work hours. *See id.* ¶ 33. Fairley then requested and received a copy of the City's Flexible Working Arrangements policy. *Id.* ¶¶ 34-36. Fairly then reached out to Joyce Cooper, writing:

> Joyce, as our previous conversation you have always stated to me that on the days we work from home (remotely)

---

[1] On April 3, 2025, the defendant moved to dismiss the original Complaint, *see* Docket Entry 8; in response thereto, the plaintiff filed the First Amended Complaint, *see* Docket Entry 11. The

defendant then withdrew Docket Entry 8 and filed the instant motion in response to the First Amended Complaint, *see* Docket Entry 12.

that it doesn't matter how much we work over because we are not eligible for comp or over time. I advised you and HR that can't be correct and read it to you both. You stated to me many time that it's different because we are government and hours worked are different from [for-]profit places of work and you are sure that the city policy is correct. I told you the story about the time a place I previously worked got in trouble for this and they were non-profit also. You advised me just the other day that the policy says remote workers is not eligible for comp time.

…

Once I became my staff supervisor, I noticed that they were working over 40 hours, logging into work at 5:00 am etc.. and I addressed to you my concerned [sic] and again advised that they should not be doing that, and it could potentially cause the City of Durham problems. You stated that it would not be a problem, because they are working remotely. You stated to me Viola…we don't want to raise that issue again because it could make us all to have to come back into the office full-time, and lord knows we don't want that. I asked you if it would be ok to stop it and talk with them about it. You said

yes, you're the supervisor and really, they should work 8:00 to 4:00.

…

As per my conversation with you Friday, I reminded you that prior to signing the Comp memo from David Boyd you and I both worked late many nights at home and occasionally from the office, and I was not granted comp time. After signing the comp time memo from David Boyd is when you stated telling [sic] me that working remotely, I would not be eligible for comp time.

*Id.* ¶ 37.

That afternoon, Flora reached out to Fairley via Microsoft Teams. *See id.* ¶ 38. Flora "told Fairley that he was considering making Fairley and her entire staff work from the office full-time to resolve the compensatory time-off issue." *See id.* Shortly thereafter, Fairley sent Flora an email with the subject line "Retaliation" and attaching a fact sheet from the North Carolina Department of Labor-Wage and Hour Division, providing information about retaliation in the workplace for complaints about wage issues. *See id.* ¶ 39.

Fairly then later emailed Flora: "Did I hear you correct when you stated that you may require non-exempt employees to come into the office full time and you asked would I agree to

3

that? I'm salary non-exempt. I feel that would be punishing me and my staff for raising my concerns about the comp and over time." *See id.* ¶ 40.

The next day, Flora, Cooper, and Sheilah Faucette, the City's Assistant Finance Director, met with Fairley. *See id.* ¶ 41. As alleged, during this conversation, "Flora belittled Fairley and told her that her email to Cooper 'is weak' and told her that 'if you decide to go to the NCDOL [] you will not win.'" *See id.* Flora asked Cooper who advised Fairley that comp time-off was not rewarded for remote work, and Cooper responded "David Boyd." *See id.* Fairley alleges upon information and belief, that David Boyd was the City's Finance Director prior to Flora assuming the role. *See id.*

The next day, on May 17, Fairley emailed Wanda Page, the City's Cit Manager, and Leonardo Williams, the City's Mayor:

> I have worked many hours over 40 hours especially during the end of the year doing 1099 and other projects in the office alongside my manager Joyce Cooper and mostly from home. My manager had advised me several times after 4:00 instead of working there to leave the office and go home to work because when you work from home you do not get Comp or Overtime pay. I advised Joyce that working without comp or overtime can't be right and

> showed her my acceptance letter from James O'Donnell in HR stating that I am salary non-exempt with comp/overtime pay.

> I would ask my manager if I could work late from home. Joyce Cooper said to me several times "You don't have to keep asking me about working over at home because you don't get comp or overtime anyway, you can work as long as you want remotely", but you do need approval from working in the office. After expressing my concerns and fear to my manager many times I contacted HR 2021-2023 via email and in person as late as November 2023 to Felecia Nolan.

> ...

> I kept working the overtime because it was needed and although I felt that what Joyce had advise me about not having comp remote was not right, I started believing that I could be the one that was wrong since she said it was different because the City of Durham is government.

> After becoming the Supervisor, I noticed that my staff was working over 40 hours some weeks. Some would log on as early as 5:00 a.m. in the morning and some would come

4

to work early on the days they work in the office, but no one asked for comp or overtime pay. I expressed my concern to Joyce Cooper and asked if I could stop it and talk with them. Joyce said if they work remotely, it's ok. I again expressed my concern and how I did not want it to come back on me. Joyce said, you are their supervisor, and you can talk with them and ask them to stop. Upon speaking with my staff, I was advised that they have been told that it is ok to do it remotely. After speaking to my staff about not working over and only working 8:00 am to 4:00 some were still logging on early and working. I expressed my concern to Joyce Cooper (my manager) and she sent a reminder email in January 2024.

...

On May 16, 2024 Tim called me and asked me if I could come into the office to meet at 3:00. I inquire [sic] why and he said to discuss your concerns and to hash out your issue with Joyce.

...

Meeting attended: Tim Flora, Sheila Faucette, Joyce Cooper and me. ... Tim would not allow me to express or say what I need to tell him. He discredits everything I said at the meeting but supported and provided excuses for everything Joyce have said to me even for the Comp and over time. Joyce says she was doing only what she was told to do about the Comp time. Tim asked Joyce who told you that and Joyce said David Boyd. Tim ASKED med [sic] if I would support my staff having to do time sheets and I told him only if everyone else have to do it and that it would be unfair to single out only my staff. Tim became upset and I reminded Tim that he asked me. I told Tim that the over time is in an email and Tim said to me "Your email is weak and if you decide to go to wage and hour you will not win".

*Id.* ¶ 42.

On May 17, 2024, Flora emailed to Fairley, Cooper, and Faucette, stating: "I believe this was a productive meeting, and while not all issues are resolved, we all agreed to the five 'wins' below." *Id.* ¶ 43. Flora then summarized the "wins" as:

1) "All non-exempt employees qualify for compensatory time or overtime pay regardless of working in the office or remotely ... "In an effort to right any wrong, perceived or otherwise, Tim has agreed to retroactively approve overtime. Viola is to provide a written request outlining the

circumstances and time requested."

2) "Regular work hours are 8 a.m. to 4 p.m. and there are no expectations of non-exempt staff working outside of these parameters without prior approval."

3) "Viola is empowered to manage who processes CPP [Contract Progress Payments] to staff."

4) "Viola would be responsible for processing voids/stop payments/modifications."

5) "Conflict resolution between Joyce and Viola
   a. Both parties agree that disagreements will be resolved on a one-on-one basis and not involve other Finance staff."

*Id*. ¶ 43.

On June 3, 2024, Fairley met with Bertha Johnson-Winbush, the City's Deputy City Manager and described the May 16 meeting with Flora, Cooper, and Faucette. Johns-Winbush asked Fairley: 'Do you want your job?' and 'Do you like your job?' Johnson-Winbush told Fairley that she supported Flora and Cooper and advised Fairley that she 'can't go around complaining about wages and hours and not expect to get the reaction you got from Tim and Joyce.'" *Id*. ¶ 44.

On June 6, Flora emailed Fairley, requesting that she provide documentation substantiating her claimed unpaid overtime/earned

comp time-off; Cooper called Fairley shortly thereafter to discuss how to find documents in support. *Id*. ¶ 45. The next day, Fairley met with Cooper in his office about an unrelated matter; Flora came to the office, as well, at which time Fairley left and returned to her desk. *Id*. ¶ 46.

Soon thereafter, Cooper sent an email to Fairley that attached a voice recording and transcript of Cooper's conversation with Flora. *Id*. ¶ 47. Fairley told Cooper that she (Cooper) shared the attachments with her (Fairley). *Id*. Cooper and Flora then came to Fairley's office, where they

told Fairley the attachments were sent to her by mistake. Flora and Cooper asked if Fairley had listened to the recording and/or read the transcript. Flora informed Fairley that Cooper filed a complaint with him regarding Fairley's complaints about unpaid overtime/earned compensatory time-off. Before Fairley could respond, Cooper yelled at her stating that the recording didn't have anything on it that Fairley could use against them. Flora additionally told Fairley that "you now know how it feels when you complained about the comp time and sent that letter to upper management." Flora and Cooper began falsely accusing Fairley of causing issues and making false complaints. Flora attacked

Fairley for "always wanting to have things your way and becoming defensive when they don't." Flora then threatened Fairley's employment because she wrote the email to Wanda Page and Leonardo Williams[.]

*Id.* ¶ 48.

A little while later, Flora returned to Fairley's office and told her "Joyce is not your friend. You are not to talk to her about anything else." Fairley tried to speak but Flora interrupted. Flora leaned across Fairley's desk and stated, "you are not to talk to her, eat lunch with her, or leave with her. She is your boss, not your friend." Fairley again attempted to speak and Flora interrupted her, stating, "I don't believe anything you say." Flora then left Fairley's office. *Id.* ¶ 49.

That same day, Fairley emailed Johnson-Winbush, including the audio recording and stating: "After receiving this and Tim and Joyce talking to me the way they talked to me today. I am leaving taking the remaining of the day off from work sick, I feel sick, my blood pressure is up and shaking." *See id.* ¶ 50. Fairley's email continued:

> When I try to talk to Tim and Joyce about the attached recording and transcript, that is when he says to me now you know how it feels when you complained about the comp time and send that letter to upper management and talk to

City Managers. When I asked about what is said about intimidation in the transcript Tim says Joyce filed a complaint stating she feels intimidated by you because you mentioned to her wage and hour.

*Id.* ¶ 51. Johnson-Winbush called Fairley later that day, per Fairley's request, "advised Fairley not to meet one-on-one with Flora or Cooper anymore and instead have email discussions with them," and told her that the City provides counseling services, as Fairley had told her she was experiencing suicidal ideations. *See id.* ¶ 53.

On June 11, Fairley emailed Flora between 12-17 emails with multiple attachments supporting her claims for comp time-off for overtime hours worked. *See id.* ¶ 55. Six days later, Flora emailed Fairley, requesting a meeting the next day to walk through the "methodology" for determining what comp time-off Fairley was owed. *See id.* ¶ 58. Later that day, Flora emailed Fairley his computation, calculating that "the City owes you 303.5 hours of comp time. That number includes any time-and-a-half hours worked over 40 hours." *See id.* ¶ 62. Flora attached the worksheets he used to "make sure [he] was capturing everything and used to determine the number of hours in a week worked over 40 hours." *Id.* Flora further noted that once they came to an agreement, he would "work with payroll to pay out any comp time over

7

240 hours, since the policy of the City is to pay out anything over 240 hours." *Id.*

Fairley ultimately wrote Flora: "I would like to request to cancel the in person resolution meeting and communicate via e-mail." *See id.* ¶¶ 63-65. Fairley then challenged Flora's calculation, and stated: "As an effort to move on from the wages and comp time that is owed to me I will consider accepting the time that you have provided as long as I am paid out the 284 hours worked @ straight time and 19.5 hours of comp time is posted to me." *See id.* ¶ 65.

Fairley emailed Flora the next day, "I feel that this complaint from Joyce Cooper and you Tim Flora on Friday June 7, 2024 and other actions is retaliation for talking about Wage and Labor and exercising my (FLSA) Fair Labor Standards Act. I feel that I will Continue to be retaliated against especially during time of my evaluation." *See id.* ¶ 66. Fairley then lodged a complaint with the City's Human Resources department. *See id.* ¶ 67.

On June 18, Flora emailed Fairley:

> I have given you ample opportunities to provide documentation to bolster your assertions regarding extra hours worked. My requests have been met with resistance. I have worked to accommodate your claims based upon limited information provided by you

with the bulk of the work done by management. I take your response of declining this afternoon's meeting as a refusal to understand the process and consider your behavior inappropriate. Further, as you have refused to meet, I stand my calculation.

*Id.* ¶ 69.

That same day, Fairley forwarded Flora's email to Johnson-Winbush and carbon copied Flora and Faucette. *See id.* ¶ 70. She added:

> I ask not to meet in person due to the history and fear of the way Tim talk and treats me and due to my mental and physical state from his and Joyce treatment. What behavior is inappropriate? Tim sent me the time and comp information for review and now as usual, if I have a voice or have anything to say or reply this is the treatment I get from him. This is not acceptable and I find it hostile and retaliatory. I also put on the e-mail this morning that I will consider accepting the amount of time he have put as long as I am paid for my hours that I worked and is due to me, the hours that I should have been paid the "Raw hours worked" the 2.50 hours up to the 40 hours week because I were paid for 37.5 hours weekly = 284 hours per Tim at straight time. The 19.5 hours of comp

time not be paid out, but recorded as comp time.

*Id.* Two days later, a representative of the HR department advised Fairley that "an investigation was ongoing regarding her complaint." *Id.* ¶ 71. Shortly thereafter, Fairley sought treatment for "suicidal ideations from the fear, stress, and depression cause by Flora and Cooper's actions[.]" *Id.* ¶ 72.

Fairley alleges that from June 20 through July 18, she "attempted to participate in the investigation and provide any supporting documents or information" to HR, but was reminded that "she [Fairley] filed the complaint and needed to be patient." *Id.* ¶ 73. On July 18, the HR point of contact emailed Fairley, informing her that the investigation had ended and "her complaint about retaliation was unsubstantiated." *Id.* ¶ 74.

On July 26, Flora informed Fairley that "due to her complaint … he felt Fairley did not trust him anymore[.]" *Id.* ¶ 75. Flora further advised Fairley that she "was being demoted from the Accounts Payable (Fiscal Coordinator) role back to the Senior Fiscal Specialist role," and that "she needed to vacate her office and move to her old cubicle." *Id.* Flora issued Fairly a written disciplinary action "for working outside of her normal scheduled hours without prior approval from her supervisor," which failed to indicate that "Fairley was being demoted." *Id.*

The City's disciplinary policy related to demotions provides, in relevant part, that "[a] Department Director may demote an employee in pay grade and decrease the employee's salary and job responsibilities, as appropriate, for such a time as is necessary to correct deficiencies in job performance, job behaviors, or job qualifications if there is a suitable position in the department." *Id.* ¶ 76. It further states that "[p]rior to the effective date of the demotion, a pre-disciplinary conference must be held and the employee must be given an opportunity to respond to the proposed demotion. If the demotion is to occur, the employee must be given an [Employee Notice Form ("ENF")] which must indicate the effective date of the demotion, new salary, and required duties[.]" *Id.*

"The Pre-disciplinary notice form must contain the date, time, and location of the conference … [and] the proposed level of discipline and [] detailed specifics about the accusations or charges against the employee and the factual basis for the disciplinary action." *Id.* ¶ 77. "Once the employee is noticed via the Pre-disciplinary Conference Notice Form, the conference can occur as soon as possible but no earlier than three (3) business days from the date of notice." *Id.*

Fairley alleges that despite this policy, Flora did not provide her with a Pre-disciplinary Conference Notice Form, nor did he schedule or conduct such a conference. *Id.* ¶ 78. Fairley alleges

upon information and belief that Flora did not include Fairley's demotion on the Employee Notice Form "to avoid Durham's pre-disciplinary conference requirement." *Id.* ¶ 79.

On August 5, Fairley told Meredith "Kelly" Robertson, the City's former Administrator, that she had been demoted and because of that, she would no longer be training her. *Id.* ¶ 83. On August 7, Cooper and Christine Collums, the City's Assistant Finance Director, held a meeting with Fairley over Microsoft Teams, at which time Cooper advised Fairley "that an investigation was being conducted regarding Fairley's alleged disclosure of information relating to the complaint she filed with Human Resources." *Id.* ¶ 84. Five days later, Cooper instructed Fairley to work remotely for the remainder of the week. *Id.* ¶ 85. On August 16, over a Microsoft Teams meeting with Cooper and Collums, Collums advised Fairley that "she was being terminated and provided her with a Pre-disciplinary Conference Form," that set the conference for August 19. *Id.* ¶ 87.

The form alleged four offenses: 1) creating an "uncomfortable work environment"; 2) "[m]aking false and/or disparaging comments about employees"; 3) not following an agreed upon directive; and 4) refusing to "train an employee per her supervisor's direction and failing to end conversations when directed to do so." *Id.* ¶ 88.

As to the first alleged offense, the form stated that

> An investigation into Viola's behavior was initiated by Christine Collum, Assistant Finance Director on August 6, 2024 after an employee spoke to Joyce Cooper about Viola's comments to the employee about Viola's Human Resources investigation. On August 7, 2024, Viola was asked about communicating to others about her investigation. Viola stated she only shared with other that she was being moved from her office. Viola denied discussing any other details of the investigation with others. Further investigation showed that Viola has shared details of the investigation with multiple employees.

*Id.* ¶ 89. As the second offense, the form stated:

> One false statement made by Viola was that she was demoted. Viola denied making this statement to anyone; however, multiple employees confirmed Viola has made that statement to them[] ... Another statement made by Viola was related to inappropriate behavior exhibited by her supervisor and the Finance Director. This behavior included yelling and use of a condescending tone with

employees. The investigation determined that Viola has made false statements to multiple employees.

*Id.* ¶ 90. As to the third offense, the form alleged that "[a]n employee informed Joyce that Viola told the employees she was recording employees. During the investigation, multiple employees acknowledged Viola made the comment to them she had recorded employees." *Id.* ¶ 91. As to the fourth offense, the form alleged multiple instances where Fairley "would turn the conversation to the investigation" and would not end a conversation when requested to do so. *Id.* ¶ 92.

Fairley alleges that these alleged offenses were "pretextual" and intended to "cover up the true reason for terminating Fairley's employment; being that she complained about unpaid overtime/unearned compensatory time-off in violation of the FLSA." *Id.* ¶ 93.

On August 19, Fairley arrived at her pre-disciplinary conference; a City police officer escorted her to HR, where Flora gave Fairley her belongings and requested that she turn in her key and badge. *Id.* ¶ 96. Collums emailed Fairley a copy of the ENF that same day, notifying her that termination was effective August 19, 2024. *Id.* ¶ 98.

In sum, Fairley alleges that Flora miscalculated the total number of hours she worked in excess of 40 over a three-year period, and that he awarded her comp time off at a 1:1 rate rather than the FLSA-required 1:1.5 rate. *See id.* ¶ 25. Specifically, Flora determined Fairley had worked 169.75 hours of compensable overtime during a three-year period prior to the filing of the instant matter[2] and so awarded her 169.75 of comp time-off instead of 254.625, for a disparity of 84.88 comp time-off hours. *See id.* ¶¶ 25, 29. And, despite regularly working in excess of 40 hours per workweek from February 3, 2022 through June of 2024, the City only paid her for earned overtime and/or provided comp time-off one time. *See id.* ¶ 27.

On August 9, 2024, the City compensated Fairley for 83.4 hours of comp time-off and awarded 232.50 comp time-off hours to her bank. *Id.* ¶ 31. On August 23, 2024, following her termination, the City compensated Fairley for the remaining 232.50 hours of comp time-off. *Id.*

## II. PROCEDURAL POSTURE

On February 3, 2025, Fairley filed suit against the City, alleging claims of FLSA violations – unpaid overtime/compensatory time-off (Count One) and retaliation (Count Two), and violations of the Article I,

---

[2] Fairley alleges that Florda determined that Fairley had worked 303.5 unpaid

hours of compensable overtime during her employment in total.

Section 1 "fruits of one's labor" clause of the North Carolina Constitution arising from alleged unlawful demotion (Count Three) and unlawful termination (Count Four). *See* Docket Entry 1. The City moved to dismiss and Fairley then amended the complaint; in response, the City withdrew its original motion to dismiss but now moves to partially dismiss the First Amended Complaint, arguing that Counts Two, Three, and Four fail to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* Docket Entries 8, 11, 12, 14. The City further moves the Cour to dismiss any FLSA claims arising prior to February 3, 2023 as time-barred. *See* Docket Entry 14. Fairley has responded in opposition and the City has replied. *See* Docket Entries 17, 18. The matter is ripe for disposition.

### III.   DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Legal conclusions "must be supported by factual allegations" that amount to more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A plaintiff is not required to prove her case in the complaint, *see, e.g.*, *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012);

*Scott v. City of Durham*, No. 1:20-CV-558, 2021 WL 3856168, at *2 (M.D.N.C. Aug. 27, 2021), but the complaint's allegations should "allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (cleaned up).

On a motion to dismiss, courts view the allegations in the complaint as true, drawing all inferences in the plaintiff's favor. *See Twombly*, 550 at 555–56 (2007); *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). But courts are not required to "accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

### A.  FLSA Statute of Limitations.

The Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201, *et seq.*, provides in relevant part that "no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for

Case 1:25-cv-00083-DAB-JGM    Document 21    Filed 06/10/26    Page 12 of 21

his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *See* 29 U.S.C. § 207(a)(1). "As a 'remedial and humanitarian statute,' the FLSA seeks to 'protect all covered workers from substandard wages and oppressive working hours.'" *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 384 (4th Cir. 2025) (first quoting *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017); then quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)). "Any employer who violates the provisions of [29 U.S.C. § 206 or § 207] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). These claims are subject to a two-year statute of limitations from when such claims accrue, or three years if the violation if "willful." *See* 29 U.S.C. § 255(a).

In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988), the Supreme Court defined willful, for purposes of this subsection, as those situations where the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited[.]" "The question of whether an employer acted willfully is generally a question of fact." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015) (citing *Martin v. Deiriggi*, 985 F.2d 129, 136 (4th

Cir.1993)). Negligent conduct is insufficient to meet this standard, *see Desmond v. PNGI Charles Town Gaming,* LLC, 630 F.3d 351, 357 (4th Cir. 2011) ("*Desmond* II"). "An employer acts with reckless disregard of the FLSA where it 'should have inquired further into whether its conduct was in compliance with the [FLSA] and failed to make adequate further inquiry.'" *Chavez-Deremer v. Jerry's Caring Hands, Inc.*, No. 1:24-CV-00213-JRR, 2025 WL 2687344, at *19 (D. Md. Sept. 19, 2025) (quoting 29 C.F.R. § 578.3(c)(3)).

Here, the City does not move to dismiss Fairley's FLSA unpaid overtime/compensatory time-off claim for failure to state a plausible claim, it simply asserts that the facts, as pled in the First Amended Complaint, do not establish willful violation of the same, and thus the two-year statute of limitations applies, encompassing only claims that accrued within two years of the filing of the complaint, that is, between February 3, 2023 and February 3, 2025.

While a motion to dismiss under Rule 12(b)(6) "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred," the district court may evaluate the merits "if all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir.

Case 1:25-cv-00083-DAB-JGM    Document 21    Filed 06/10/26    Page 13 of 21

2007) (en banc) (emphasis and alteration omitted).

Here, the plaintiff asserts this is not such a case. And, indeed, courts within this Circuit have viewed granting a motion to dismiss certain FLSA claims as time-barred at the pleading stage with a skeptical eye. As this Court has recently confirmed in *Rose v. Harloe Management Corp.*, No. GLR-16-761, 2017 WL 193295, at *4 (D. Md. Jan. 17, 2017), [b]ecause the question of whether [a defendant's] alleged [FLSA] violations were willful is not an element of plaintiff[s'] claims; but rather an anticipat[ion of] a limitations defense that [the] defendant[ ] may raise, [plaintiffs] do[ ] not need to allege specific facts that [the] defendant[ ] willfully violated the FLSA." *See Aviles-Cervantes v. Outside Unlimited, Inc.*, 276 F. Supp. 3d 480, 491 (D. Md. 2017) (internal quotations and citation omitted) (alterations in original). *See also Aguilar v. ALCOA Concrete & Masonry, Inc.*, No. TDC-15-0683, 2015 WL 6756044, at *2 (D. Md. Nov. 4, 2015) (rejecting defendant's argument in its motion to dismiss that plaintiff did not adequately plead willfulness because it is an affirmative defense); *Ford v. Karpathoes, Inc.*, No. ELH-14-0824, 2014 WL 6621997, at *9, (D. Md. Nov. 20, 2014) ("[P]laintiffs do not need to allege specific facts supporting their allegation that defendants willfully violated the FLSA."). Thus, while plaintiffs "may bear the burden to prove willfulness, ... [Rule 12(b)(6) ] does not require that Plaintiffs prove

their claims at this stage." *Alcorn v. George Mason Mortg., LLC*, No. RDB-15-2727, 2016 WL 3440261, at *4 (D. Md. June 23, 2016).

Even if such a finding were appropriate at this stage in the proceedings, Fairley's allegations would survive. She asserts that the City's "violation of the FLSA was willful, intentional, and taken with reckless disregard for [her] rights." *See Aviles-Cervantes*, 276 F. Supp. 3d at 491 (finding plaintiffs' FLSA claim adequately pled willfulness based, in part, on allegations that the defendant "acted willfully or with reckless disregard in failing to pay [them] and the other class members in conformance with the requirements of the FLSA."). While the allegation is conclusory in nature, the First Amended Complaint contains multiple instances where Fairley raised the issue of receiving compensatory time-off after 40 hours worked in a workweek. *See, e.g.*, Compl. ¶¶ 21, 30, 33, 37, 41. This is sufficient for purposes of Rule 12(b)(6). *See generally White v. City of Richmond*, No. 3:18-CV-504-JAG, 2019 WL 2141924, at *3 (E.D. Va. May 16, 2019) (finding plaintiffs' assertion that "reporting overtime resulted in a verbal battle... with administration to even get paid for it" created genuine issue of fact as to willfulness, precluding summary judgment) (internal quotation omitted); *see also Akers v. Cnty. of Sampson*, No. 7:22-CV-43-FL, 2022 WL 16936034, at *7 (E.D.N.C. Nov. 14, 2022) (finding that the plaintiff adequately pled willfulness with "allegations . . . of

14

altering time records, and ignoring repeated requests by the sheriff for different pay accounting, despite alleged awareness of the requirements of the FLSA[]”).

Thus, this Court should deny the City's motion to dismiss all FLSA overtime and/or compensatory time-off claims accruing between February 3, 2022 and February 3, 2023.[3]

### B. FLSA retaliation claim.

The City next argues that the Court should dismiss Fairley's FLSA retaliation claim (Count Two) for failure to plead a causal connection between the protective activity and adverse actions suffered. The Court should deny the motion as to this Count, as well.

"The retaliation provision of the FLSA is a central component of the Act's complaint-based enforcement mechanism." *See Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th

Cir. 2008). This subsection of the FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). And, as the Fourth Circuit has noted, per the Supreme Court directive, courts should not "interpret[] or appl[y this provision] in a narrow, grudging manner." *See Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 364 (4th Cir. 2000) (internal quotation and citation omitted).

"A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action."[4] *Wai*

---

[3] The City also moves the Court to dismiss a "recordkeeping" component of Count One, *see* Docket Entry 14, at 12, but as Fairley correctly notes, the FLSA does not provide for a private cause of action related to recordkeeping, nor does she advance one, *see* Docket Entry 17, at 10-11.

[4] Courts have applied the *McDonnell Douglas* burden-shifting framework to FLSA retaliation claims. *See Jackson v. Mayor & City Council of Baltimore City*, No. CIV JFM 08-3103, 2009 WL 2060073, at *2 (D. Md. July 14, 2009), citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997). And it is

well-settled that a plaintiff claiming Title VII or ADEA violations, which also employ the same burden shifting framework, "need not plead facts constituting a McDonnell Douglas prima facie case of discrimination to survive a motion to dismiss." *Johnson v. Lemonds*, No. 1:15CV410, 2016 WL 447494, at *1 (M.D.N.C. Feb. 4, 2016) (denying defendant's motion to dismiss retaliation claims, citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514-15 (2002)). "Yet, in reviewing motion to dismiss rulings, the Fourth Circuit continues to speak of a prima facie Title VII retaliation claim. Similarly, in analyzing motions to

Case 1:25-cv-00083-DAB-JGM    Document 21    Filed 06/10/26    Page 15 of 21

*Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1042 (4th Cir. 2020), citing *Darveau*, 515 F.3d at 340. "[A] plaintiff asserting a retaliation claim under the FLSA need only allege that his employer retaliated against him by engaging in an action 'that would have been materially adverse to a reasonable employee' because the 'employer's actions ... could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *See Darveau*, 515 F.3d at 343 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

   1. Fairley alleges she engaged in protected activity.

When analyzing retaliation claims, it is well-settled that "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). And the City does not dispute that Fairley has adequately pled this prong of the analysis. *See* Docket Entry 14, at 14-18.

   2. Fairley alleges that she suffered adverse action by her employer.

As to the second prong, a "plaintiff asserting a retaliation claim under the FLSA need only allege that her employer retaliated against her by engaging in an action "that would

have been materially adverse to a reasonable employee because the employer's actions ... could well dissuade a reasonable worker from making or supporting a charge of discrimination." *See Darveau*, 515 F.3d at 343. It need not constitute "a materially adverse employment action." *See id*.

Fairley alleges both, as demotion and certainly termination constitute adverse actions under any employment framework. The plain language of the statute includes prohibition on "discharging" any employee for retaliatory purposes. *See Alley v. Quality Eco Techs., LLC*, No. 3:20CV355, 2021 WL 1196188, at *10 (E.D. Va. Mar. 29, 2021) ("[T]he Court also finds that QET took adverse action against Plaintiffs Atkinson and Bratton when it terminated their employment."). And the City does not dispute that Fairley has adequately alleged this prong of the analysis. *See* Docket Entry 14, at 14-18.

   3. Fairley alleges a causal connection between the protected activity and adverse action.

The City disputes that Fairley has adequately pled causality, the third prong of a *prima facie* retaliation complaint. This prong "requires either: (1) that the retaliation closely

---

dismiss retaliation claims, district courts in the Fourth Circuit continue to rely on decisions evaluating, at or after summary judgment, the McDonnell Douglas prima

facie case." *See id*. (collecting cases). However, even applying the more exacting of the two standards, Fairley's retaliation claim survives.

followed the protected activity, or (2) that the plaintiff put forth a sufficient explanation for the delay between the protected activity and the alleged retaliation." *Reardon v. Herring*, 201 F. Supp. 3d 782, 784 (E.D. Va. 2016) (citations omitted). There is no hard and fast rule as to "how closely the adverse action must follow the protected conduct," but "even a ten-week delay 'is sufficiently long so as to weaken the inference of causation between the two events.'" *See id.* at 785 (quoting *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012)). Where the time between the conduct and the adverse action "is too great to establish causation based solely on temporal proximity, a plaintiff must present other relevant evidence … to establish causation, such as continuing retaliatory conduct and animus in the intervening period." *Perry*, 489 F. App'x at 643 (internal quotations omitted). *See also Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) ("Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation[.]").

As alleged, Fairley complained to Flora on May 6, 2024 about the City's failure to award comp time-off for remote work performed in excess of 40 hours per workweek. Compl. ¶ 33. What followed was a series of back-and-forth communications regarding the same with Fairley, Flora, and Cooper. *See id.* ¶¶ 36-40. Ten days later, Cooper allegedly told Fairley that one of her emails was "weak" and

"if you decide to go to the NCDOL, you will not win." *See id.* ¶ 41. On June 7, 2026, Flora informed Fairley that Cooper had filed a complaint with Flora about Fairley's "complaints about unpaid overtime/earned compensatory time-off[.]" *See id.* ¶ 48. In a meeting between Cooper, Flora, and Fairley on that day, "Flora and Cooper began falsely accusing Fairley of causing issues and making false complaints" and "Flora then threatened Fairley's employment because she wrote the email to Wanda Page and Leonardo Williams" regarding the comp time-off issue. *See id.*

Fairley then provided Flora, per his request, documentation for retroactive comp time-off and they engaged in a back-and-forth regarding the proper figure. *See id.* ¶¶ 55, 58-66, 69. Fairley lodged an official complaint with HR on June 18. *See id.* ¶ 67.

On July 26, 2026, the City demoted Fairley. *See id.* ¶ 75. On August 19, the City fired her. *Id.* ¶ 96.

Almost three months passed between Fairley's May 6 complaint to Flora and her demotion on July 26. The Fourth Circuit has specifically noted: "Although neither we nor the Supreme Court have adopted a bright temporal line, we have held that a three- or four-month lapse between the protected activities and discharge was too long to establish a causal connection by temporal proximity alone[.]" *Pascual v. Lowe's Home*

*Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (unpublished).

The question then, is whether Fairley has pled "continuing retaliatory conduct and animus in the intervening period." *See* 489 F. App'x at 643 (internal quotations omitted). *See also Reardon v. Herring*, 201 F. Supp. 3d 782, 786 (E.D. Va. 2016) ("[A]n employer steadily working toward effecting an adverse action and subsequently taking that action at the first convenient opportunity, combined with articulated continuing animus, can meet the plausibility standard for pleading causality, at least at the motion to dismiss stage."). To that end, Fairley has alleged:

- May 16: Cooper stated one of the emails related to the issue was "weak" and if she went to the NCDOL she "would not win"
- June 7: Cooper filed a complaint against Fairley for Fairley's complaint about unpaid overtime/earned compensatory time-off
- June 7: Cooper and Flora accused Fairley of making false complaints
- June 7: Flora threatened Fairley's employment for advising Page and Williams of the alleged unpaid overtime/earned compensatory time-off

Fairley's demotion then occurred approximately five weeks after she filed a complaint with HR.

When examining continuing retaliatory conduct and animus, the case law does draw a distinction between "ordinary tribulations of the work place ... petty slights or minor annoyances that often take place at work and that all employees experience[,]" *see Burlington N. & Santa Fe. Ry.*, 548 U.S. at 68, and materially adverse actions. Cooper's comments on May 16 may debatably constitute a petty slight or minor annoyance, but filing a complaint against Fairley, accusing Fairley of making false claims, and threatening Fairley's employment hew closer to retaliatory conduct and animus, falling during the intervening period. Drawing all reasonable inferences in Fairley's favor here, she has sufficiently alleged a causal connection between the protected activity and the adverse action. *See, e.g.*, *Williams v. Newport News Sch. Bd.*, No. 4:20-CV-41, 2021 WL 3674983, at *16 (E.D. Va. Aug. 19, 2021) (finding that temporal proximity between filing of EEOC charge and adverse action was too lengthy to demonstrate causation, but "the temporal proximity between Plaintiff's internal complaints [January 23, 2017] and the Defendant's placement of Plaintiff on administrative leave [February 6, 2017] and involuntary transfer [March 23, 2017] is sufficient to allow the Court to infer causation at this [motion to dismiss] stage in the proceedings.").

This claim should survive and the City's motion to dismiss it should be denied.

C. North Carolina Constitutional claims.

The City next moves to dismiss Counts Three and Four of the First Amended Complaint, both premised on the "fruits of their own labor clause." The Court should grant the motion as to these counts.

As this is a state law claim, the Court must predict how the North Carolina Supreme Court would rule on a disputed issue of state law. *See Twin City Fire Ins. Co. v. Ben Amold-Sunbelt Beverage Co.*, 433 F.3d 365, 369 (4th Cir. 2005). The court first looks to opinions of that court, *see Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016) and if there no such governing opinions, the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." *See Twin City Fire Ins. Co.*, 433 F.3d at 369 (quotations and citation omitted). "In predicting how the highest court of a state would address an issue, this court must 'follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently.'" *Soto v. Town of Rolesville*, 729 F. Supp. 3d 533, 543 (E.D.N.C. 2024) (quoting and citing *Town of Nags Head v. Toloczko*, 728 F.3d 391, 398 (4th Cir. 2013) and quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 630 & n.8 (1988)). However, the court "should

not create or expand a [s]tate's public policy." *Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted).

Article I, Section 1 of the North Carolina Constitution provides in relevant part that "all persons are ... endowed by their Creator with certain inalienable rights," including "the enjoyment of the fruits of their own labor." N.C. Const. art. I, § 1. The North Carolina Supreme Court has noted that "[o]ur Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens" and that "[w]e give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to both person and property." *See Corum v. Univ. of North Carolina*, 413 S.E.2d 276, 290 (N.C. 1992).

The court has further extrapolated this right to encompass "a public employee's liberty interest in pursuing her chosen profession free from unreasonable actions of her employer." *Tully v. City of Wilmington*, 810 S.E.2d 208, 214 (N.C. 2018) (referencing *Presnell v. Pell*, 260 S.E.2d 611, 613 (1979)). In *Presnell*, a school employee alleged that the principal fired her based on false allegations, and "while she had no cognizable property interest in continued employment, ... her

19

complaint does however sketch a colorable claim that a constitutionally protected 'liberty' interest may be at stake. One of the liberty interests encompassed in the Due Process Clause of the Fourteenth Amendment is the right 'to engage in any of the common occupations of life,' unfettered by unreasonable restrictions imposed by actions of the state or its agencies." *See Tully*, 810 S.E.2d at 214 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

The right, however, is "not without limitation." *See id*. at 216. "[T]o state a direct constitutional claim grounded in this unique right under the North Carolina Constitution, a public employee must show that no other state law remedy is available and plead facts establishing three elements: (1) a clear, established rule or policy existed regarding the employment promotional process that furthered a legitimate governmental interest; (2) the employer violated that policy; and (3) the plaintiff was injured as a result of that violation." *See id*.

The City argues that Fairley has not met the second prong, that is, the First Amended Complaint does not allege "a clear, established rule or policy" regarding "the employment promotional process." And indeed, it does not. While the First Amended Complaint sets forth the City's disciplinary policy, *see* Compl. ¶¶ 76-77, 94, it is not a promotional process and so does not meet the pleading requirements established by *Tully*.

*See Soto v. Town of Rolesville*, 729 F. Supp. 3d 533, 544 (E.D.N.C. 2024) ("This policy is not a promotional policy. It is a discretionary pay policy. Thus, Soto cannot use it to seek relief under Article I, Section 1 [of the North Carolina Constitution].") (internal citation omitted).

Despite *Tully*'s plain language in this regard, Fairley encourages the Court to extrapolate upon it, arguing that "[a]lthough *Tully* established the framework in a promotional context, nothing in the court's reasoning explicitly limits 'the fruits of their own labor' claim to the promotional process only." *See* Docket Entry 17, at 17. This is a direct invitation to "create or expand a [s]tate's public policy," which Fourth Circuit precedent clearly prohibits. *See Time Warner Ent.-Advance/Newhouse P'ship*, 506 F.3d at 314. To the extent that Fairley insists the North Carolina Court of Appeals' decision in *Mole v. City of Durham*, 866 S.E.2d 773 (N.C. Ct. App. 2021) (*Mole I*) changes the calculus, the North Carolina Supreme Court specifically ordered that it had no precedential value, *see Mole v. City of Durham*, 884 S.E.2d 711 (N.C. 2023) (per curiam) (*Mole II*). And the district court's suggestion in *Akers v. County of Sampson*, No. 7:22-CV-43-FL, 2022 WL 16936034, at *7 (E.D.N.C. Nov. 14, 2022), that "failure to follow 'pre-disciplinary procedures . . . designed to further a legitimate government interest'" violated Article I, Section 1 relied specifically on *Mole I* and was issued in advance of *Mole II*.

20

The North Carolina Supreme Court had the opportunity to apply this clause to pre-disciplinary procedures and explicitly passed. Thus, *Tully* remains the standard and its language is clear. Because Fairley has not alleged a violation of a promotional process, her claims reliant on Article I, Section 1 of the North Carolina Constitution fail and it is recommended that they be dismissed.

## IV. CONCLUSION

It is therefore **RECOMMENDED** that the Court grant in part and deny in part the defendant's Motion to Dismiss, in that the Court should grant in part the Motion to Dismiss as to Counts Three and Four, dismissing those claims, and otherwise deny the Motion.

JoAnna Gibson McFadden
United States Magistrate Judge

June 10, 2026
Durham, North Carolina

21